Affirmed and Memorandum Opinion filed December 23, 2004









Affirmed
and Memorandum Opinion filed December 23, 2004.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-04-00496-CV

____________

 

IN THE INTEREST OF
B.S.W.

 

 



 

On Appeal from the 314th
District Court

Harris County, Texas

Trial Court Cause No.  02-09039J

 



 

M E M O R A N D U M   O P I N I O N

In three issues, appellant Margot Delores
Woods challenges the termination of her parental rights to her daughter,
B.S.W.  In her first issue, she contends
the trial court erred in denying her oral motion for continuance based upon the
absence of an expert witness.  In her
second and third issues, she contends the evidence is legally and factually
insufficient to support the trial court’s findings that (1) Ms. Woods engaged
in conduct or knowingly placed the child with persons who engaged in conduct
which endangers the physical or emotional well-being of the child, and (2)
termination of the parent-child relationship is in the child’s best
interest.  For the reasons stated below,
we affirm.

 

 








I.        Factual
and Procedural Background

A.      Ms.
Hutchins Meets Ms. Woods & B.S.W. at the Hospital and Begins to Care for
B.S.W. for Periods of Time.

On January 6, 1999, B.S.W. was born to Ms.
Woods.  For the first nine months of her
life, B.S.W. lived with Ms. Woods and B.S.W.’s father, Darion Steinback.[1]  During this time, Ms. Woods began having
“relationship and employment problems,” and was also using crack cocaine.  Ms. Beatrice Marie Jackson-Hutchins (Ms.
Hutchins), a social worker at the hospital where B.S.W. was born and B.S.W.’s
godmother, helped Ms. Woods care for B.S.W. and watched her on weekends.  In November of 1999, B.S.W. began living with
Ms. Hutchins.  Ms. Woods visited periodically
with B.S.W. and would take her out on weekends and return her on Sundays.  Ms. Woods also had two older children who
were living with her mother. 

Shortly after Ms. Woods left B.S.W. in Ms.
Hutchins’s care, she went to Las Vegas for three weeks and rendezvoused with
Mr. Steinback there.  While in Las Vegas,
Ms. Woods was arrested for prostitution and served time.  Ms. Woods was on probation at the time, and
the trip violated her probation.  

Ms. Hutchins continued to keep B.S.W.
until January of 2002.[2]  Ms. Hutchins paid for all of B.S.W.’s needs,
including diapers, pull-ups, and clothes, and enrolled her in a private school.[3]  During that time, Ms. Woods continued having
drug abuse problems and checked herself into treatment programs at Santa Maria
and the Star of Hope.  Although Ms. Woods
completed the Star of Hope program in November of 2001, she later
relapsed.  








One long Thanksgiving weekend when Ms.
Woods took B.S.W. for the holiday, Ms. Hutchins tried repeatedly to contact her
about bringing B.S.W. back early so she would not be too tired for school.  That Sunday evening, one of Ms. Woods’s
friends came by without B.S.W. and told Ms. Hutchins that Ms. Woods had asked a
lady she met at her mailbox, who she barely knew, to watch B.S.W. for a couple
of hours.  However, by Sunday B.S.W. was
still with the woman, who was upset and wanted $50.00 to release B.S.W.  Ms. Hutchins paid the woman and got B.S.W.
back.  When Ms. Hutchins saw Ms. Woods
the following Tuesday, she looked like “she had just come off something.”  Thereafter, Ms. Hutchins became concerned and
stopped allowing Ms. Woods to visit B.S.W.

Later, however, B.S.W. resumed living with Ms. Woods.  After several months, Ms. Woods resumed
abusing cocaine.  At first she used
cocaine on the weekends, but then began using it every day.  She would leave B.S.W. with babysitters and
go out.  Eventually, in November of 2002,
Ms. Woods “crashed” on cocaine, had suicidal thoughts, and cut herself on her
arms.  She called 911 and was admitted to
a psychiatric hospital.  At the time of
this incident, she was on probation for assaulting a police officer.  Because Ms. Woods tested positive for cocaine
at the hospital and also had earlier tested positive at the probation office,
she went to the county jail.  There, she
went into the SAFPE program, which provided services to her, including a
substance abuse program.  She remained
incarcerated for approximately one year.[4]  

 

B.      The
Texas Department of Protective and Regulatory Services Assumes Conservatorship
of B.S.W.








Shortly before Ms. Woods crashed on
cocaine, the Texas Department of Protective and Regulatory Services (TDPRS or
“the agency”)[5]
had received referrals alleging neglectful supervision and possible sexual
abuse of B.S.W.  The allegation of sexual
abuse was never validated.  However, when
Ms. Woods went to jail, on November 5, 2002, the agency filed suit and
requested emergency custody of B.S.W. 
Later, Ms. Hutchins and her parents intervened in the suit, seeking to
be appointed as managing conservator of B.S.W. 


After the agency attempted unsuccessfully
to place B.S.W. with relatives, the trial court ordered mediation.  It was agreed at a mediation in August of
2003 that B.S.W. would be placed with Ms. Hutchins and her husband, and Ms. Woods
and Mr. Steinback’s sister were allowed supervised visitation with B.S.W.  Although the trial court ordered a home study
on Ms. Hutchins and placement of B.S.W. with her “if appropriate” prior to a
background check, B.S.W. was not immediately placed with her.  Instead, she first went to a shelter and then
a foster home.  A psychologist who had
seen B.S.W. initially had reservations about placing B.S.W. with Ms. Hutchins
because Mr. Hutchins had a history of substance abuse and had to go into the
SAFPE program.  However, Mr. Hutchins
completed the program.  B.S.W. was
returned to the Hutchins home in August of 2003 as agreed in the mediation.

In January of 2004, Ms. Woods attended a
pretrial hearing in this case.  Less than
two weeks later, she relapsed on cocaine and alcohol.  Later, she testified at trial that she
relapsed because she felt overwhelmed and pressured after visiting with B.S.W.
with the case workers and child advocates present.  

C.      The
Trial and Ultimate Termination of Parental Rights.








In April of 2004, the trial of this case
was conducted before a master.  Hope
Myers, the agency caseworker, testified regarding the agency’s involvement with
B.S.W., and opined that termination of Ms. Woods’s parental rights was in the
child’s best interest.  Viola Riswell,
B.S.W.’s guardian ad litem and volunteer Child Advocate, testified that she had
monthly contacts with B.S.W. and also visited the Hutchinses’ home.  She testified that B.S.W. had behavioral
problems while she was in foster care, but these problems were resolved after
she was placed with the Hutchinses in August of 2003.  She also testified that B.S.W. appeared to
have bonded with the Hutchinses and called them “mommy and daddy.”  Ms. Riswell also testified that B.S.W.’s
contacts with Ms. Woods were disruptive and not beneficial.  Nicole Taylor, who had been B.S.W.’s teacher
for nine months, testified that B.S.W. was doing well academically and
behaviorally.  She also testified that
B.S.W. reacted negatively after her visits with Ms. Woods.  

Ms. Woods testified that she first started
using cocaine nine years earlier, when she was 25.  She also admitted that she was soliciting
prostitution in Las Vegas.  She recounted
her history, and testified regarding the progress she had made since the agency
took custody of B.S.W.  She also
testified that she had completed the services the agency had required, except
for individual counseling services she had only recently begun.  She testified that she obtained employment at
her earliest opportunity, and had a car, an apartment, furniture, and a bed for
B.S.W.  Additionally, she stated that she
had tested negative for cocaine in the month preceding the trial.

Ms. Woods’s mother, Carolyn Prade,
testified about how she assumed care of Ms. Woods’s older children.  She testified the oldest child came to live
with her because it was more convenient for her to take the child to school
from her house, and the younger one came to live with her because she “didn’t
like the hours” Ms. Woods was keeping. 
However, she admitted that Ms. Woods had problems with depression and
chemical dependency.  Ms. Prade testified
that she had seen a change in Ms. Woods and Ms. Woods was “doing everything
that a parent can do for the betterment of her life situation.”  She also testified that Ms. Woods had been
spending a lot of time with her two older children, and she would like Ms.
Woods to take them to stay with her in the summer after school was out.

Ms. Hutchins testified regarding her care
of  B.S.W. and her experiences with her
and Ms. Woods.  She also testified about
Mr. Hutchins’s earlier substance abuse, that he had completed his treatment
program, and that he has not had any problems. 
She testified they were willing to adopt B.S.W. and raise her as their
own.  She also testified that visits with
her mother confused B.S.W. and disrupted her behavior.  On cross-examination, Ms. Hutchins testified
that, if the court did not terminate Ms. Woods’s parental rights, she would no
longer continue playing an active role in B.S.W.’s life, because she did not
think she “could handle that with her.”








On April 27, 2004, the trial court signed
an order of termination terminating Ms. Woods’s parental rights to B.S.W.  This appeal ensued.

II.       Analysis

A.      The
Motion for Continuance

In her first issue, Ms. Woods contends the trial court erred
in denying her oral motion for continuance to secure the testimony of Ms.
Woods’s substance abuse counselor, Ms. Willie Watson.  Shortly after the start of the second day of
testimony, Ms Woods’s counsel requested the continuance, explaining that two
subpoenas issued earlier for Ms. Watson were not served, and requesting that
the trial be continued so that Ms. Watson could be subpoenaed and appear.  Rather than grant the continuance, the court
instructed counsel to question Ms. Woods and to proffer testimony concerning
what Ms. Watson might have said had she appeared.  Ms. Woods testified that Ms. Watson was
optimistic about her progress and her prospects for continued sobriety.  On appeal, Ms. Woods contends that Ms.
Watson’s testimony was “extremely relevant” to her case and would have been
more effective than Ms. Woods’s own “self-serving” testimony. 

A motion for continuance shall not be granted except for
sufficient cause supported by an affidavit, consent of the parties, or by
operation of law.  Tex. R. Civ. P. 251.  The record does not contain a written motion
for continuance or an affidavit.[6]  Because Ms. Woods did not comply with Rule
251, the trial judge did not abuse her discretion in denying the motion.  See Villegas v. Carter, 711 S.W.2d
624, 626 (Tex. 1986); In re E.L.T., 93 S.W.3d 372, 375 (Tex.
App.—Houston [14th Dist.] 2002, no pet.); Ohlhausen v. Thompson, 704
S.W.2d 434, 436 (Tex. App.—Houston [14th Dist.] 1986, no writ). 

We overrule Ms. Woods’s first issue.

 








B.      Legal
and Factual Sufficiency of the Evidence Supporting Termination of Parental
Rights

1.       Standard
of Review

The burden of proof at trial in parental termination cases is
by clear and convincing evidence.  Tex. Fam. Code § 161.001; In re
J.F.C., 96 S.W.3d 256, 263 (Tex. 2002). 
“Clear and convincing evidence” means the measure or degree of proof
that will produce in the mind of the trier of fact a firm belief or conviction
as to the truth of the allegations sought to be established.  In re C.H., 89 S.W.3d 17, 25–26 (Tex.
2002).

When reviewing a “no evidence” or legal sufficiency of the
evidence point, therefore, we look at all the evidence in the light most
favorable to the finding “to determine whether a reasonable trier of fact could
have formed a firm belief or conviction that its finding was true.”  In re J.F.C., 96 S.W.3d at 266.  If, after conducting our review of the record
evidence, we determine that no reasonable fact finder could form a firm belief
or conviction that the matter that must be proven is true, then we conclude
that the evidence is legally insufficient. Id.

When reviewing a challenge to the factual sufficiency of the
evidence, we give due consideration to evidence that the fact finder could
reasonably have found to be clear and convincing.  Id.; In re C.H., 89 S.W.3d at
25–26.  We determine whether the evidence
is such that a fact finder could reasonably form a firm belief or conviction
about the truth of the State’s allegations. 
In re J.F.C., 96 S.W.3d at 266. 
We consider whether disputed evidence is such that a reasonable fact
finder could not have resolved that disputed evidence in favor of its
finding.  Id.  If, in light of the entire record, the
disputed evidence that a reasonable fact finder could not have credited in
favor of the finding is so significant that a fact finder could not reasonably
have formed a firm belief or conviction, then the evidence is factually
insufficient.  Id.








We also note that the natural right that exists between
parents and their children is one of constitutional dimension.  In re J.W.T., 872 S.W.2d 189, 194–95
(Tex. 1994).  A parent’s right to “the
companionship, care, custody and management” of his or her children is a
constitutional interest “far more precious than any property right.”  Santosky v. Kramer, 455 U.S. 745,
758–59 (1982) (quoting Stanley v. Illinois, 405 U.S. 645, 651
(1972)).  Therefore, in a case
terminating parental rights, proceedings should be strictly scrutinized and the
involuntary termination statutes strictly construed in favor of the
parent.  Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985).

2.       Applicable
Law

In Texas, to terminate a parent‑child relationship, a
trial court must find by clear and convincing evidence that (1) termination is
in the best interest of the child, and (2) the parent committed one or more of
the acts specifically named in the Texas Family Code as grounds for
termination.  Tex. Fam. Code § 161.001; Richardson v. Green, 677
S.W.2d 497, 499 (Tex. 1984).  Proof of
one element does not relieve the petitioner from establishing the other.  Holley v. Adams, 544 S.W.2d 367, 370
(Tex. 1976).  It is inconsequential that
the actions occurred before or after birth. 
In re S.F., 32 S.W.3d 318, 322 (Tex. App.—San Antonio 2000, no
pet.); Avery v. State, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st
Dist.] 1997, no writ).

Here, the trial court found that termination was in the best
interest of the child, see Tex.
Fam. Code § 161.001(2), and that one ground under section 161.001—that
appellant had engaged in conduct, or knowingly placed B.S.W. with persons who
engaged in conduct, that endangered B.S.W.’s physical or emotional well‑being—supported
termination.  See Tex. Fam. Code § 161.001(1)(E). 

a.       The
legal and factual sufficiency of the evidence of endangerment








In her second issue, Ms. Woods contends the evidence is
legally and factually insufficient to support the trial court’s finding, by
clear and convincing evidence, that Ms. Woods engaged in conduct or knowingly
placed the child with persons who engaged in conduct which endangered B.S.W.’s
physical or emotional well-being.  Of the
bases advanced for endangerment, including a referral for sexual abuse and
neglect, substance abuse, and suicide attempts, Ms. Woods contends none support
the trial court’s finding.  This is so,
she asserts, because alleged sexual abuse was ruled out, the evidence showed
Ms. Woods did not actually attempt suicide but merely had suicidal thoughts,
and she left B.S.W. with responsible babysitters.  Consequently, she contends there is
“absolutely no evidence in the record to establish in any way that B.S.W. was
ever physically abused, neglected or routinely left with strangers.”

Concerning Ms. Woods’s substance abuse, she contends the
agency caseworker and B.S.W.’s guardian ad litem were not credible witnesses
because, instead of being advocates for B.S.W., they were instead advocates for
Mrs. Hutchins, who wanted to adopt B.S.W. and would not remain in her life
unless Ms. Woods’s parental rights were terminated.  As support for her contention, Ms. Woods
complains that B.S.W.’s caseworker and guardian ad litem emphasized that Ms.
Woods’s past drug use could support the termination of her parental rights,
while at the same time they did not consider Mr. Hutchins’s history of
addiction significant to B.S.W.’s placement. 
She also asserts those witnesses discounted Ms. Woods’s efforts to
complete the services the agency required, to improve her situation, and to
provide for B.S.W.  However, we disagree
that the evidence is legally and factually insufficient to support the finding
on endangerment.

Whether a child has been endangered for
purposes of this finding under subsection (E) is more than a threat of
theoretical injury or possible ill effects of a “less-than-ideal” family
environment.  Tex. Dep’t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).  “Endanger” means to jeopardize the child or
to expose the child to loss or injury.  Id. 
Endangerment encompasses the following:

·                     
endangerment
can be exhibited by both actions and failures to act;

·                     
endangering
acts need not be directed at the child or cause actual injury or threat of
injury to the child;

·                     
endangerment
may be satisfied by showing a parent engaged in a “course of conduct” that
endangered the child’s physical or emotional well-being;








·                     
endangerment
may include evidence that a parent has been imprisoned;

·                     
endangerment
may include evidence of drug addiction and its effect on a parent’s life and
her ability to parent; and

·                     
endangerment may include what a parent does both before and
after birth of a child.

In re U.P., 105 S.W.3d 222, 233 (Tex. App.—Houston
[14th Dist.] 2003, pet. denied) (citations omitted).

With these considerations in mind, a
reasonable fact finder could have found legally and factually sufficient
evidence to support the finding of endangerment.  The evidence is undisputed that Ms. Woods has
a history of illegal drug use, criminal activity, and imprisonment.  She started using cocaine when her oldest
child was five years old and her second child was one year old.  The trial court could have found that Ms.
Wood’s mother took over the responsibility of caring for the older children
because Ms. Woods’s substance abuse and other conduct was jeopardizing their
well-being.  Continuing this pattern, Ms.
Woods admitted that when she handed over B.S.W. to Ms. Hutchins’s care she was
using crack cocaine.

Then, in the same month that Ms. Hutchins
began keeping B.S.W., Ms. Woods admitted that she went to Las Vegas, in
violation of her probation, and engaged in prostitution.  While Ms. Woods later checked herself into a
rehabilitation program at the Star of Hope and completed the program, she admitted
at trial that she relapsed when she was moved to the housing side of the
program.  








Ms. Woods also admitted that, just a few
months after Ms. Hutchins returned B.S.W. 
to her, she “crashed” using crack cocaine.  She also admitted that she cut her arms while
under the influence of drugs and stopped taking her depression medicine.  In addition, although Ms. Woods did not abuse
drugs while in jail and completed a substance abuse program while there, that
did not prevent her from using drugs again once she got out—only four months
before the trial of this case.  Ms. Woods
explained that she used drugs because she felt very pressured and
overwhelmed.  However, her inability to
refrain from substance abuse at a time when her conduct was under the court’s
scrutiny and could affect her right to parent B.S.W. contradicts her assertion
that her recent conduct demonstrated her improvement and ability to provide for
B.S.W.  

Likewise, Ms. Woods’s contention that the
agency wanted her parental rights terminated so that the Hutchinses could adopt
B.S.W., and therefore discounted Mr. Hutchins’s drug use, does not alter the
facts about her own conduct that include criminal activity, years of substance
abuse both before and after B.S.W. was born, and absence caused by
imprisonment.  And, although Ms. Woods
assails the testimony of the agency’s case worker, the guardian ad litem, and
Ms. Hutchins as not credible, the trial court was in the best position to
resolve conflicts in evidence and weigh the credibility of these witnesses.  Among other things, Ms. Hutchins testified to
the episode that occurred while B.S.W. was in her care in which Ms. Woods took
B.S.W. over a Thanksgiving holiday, and later left the child with a woman Ms.
Woods barely knew, who would not return B.S.W. until Ms. Hutchins paid her
$50.00.  Given this testimony, and the
other evidence discussed above, a reasonable fact finder could have determined,
by clear and convincing evidence, that Ms. Woods engaged in conduct, or knowingly placed B.S.W. with
persons who engaged in conduct, that endangered B.S.W.’s physical or emotional
well‑being. 

Based on our review of the evidence, we
find that it is legally and factually sufficient to support the trial court’s
finding of endangerment.  We overrule Ms.
Woods’s second issue. 

b.       The
legal and factual sufficiency of the evidence that termination was in B.S.W.’s
best interest








In her third issue, Ms. Woods contends the
evidence is legally and factually insufficient to support, by clear and
convincing evidence, the trial court’s finding that termination of her parental
rights is in B.S.W.’s best interest.  She
relies on the same evidentiary arguments to support this issue.  She contends the only possible impediment to
her ability to parent B.S.W. was her “addiction to cocaine and her propensity
to relapse” and points out that, at the time of trial, she was “doing
everything within her power” to provide a stable and safe environment for
B.S.W.  Her efforts included holding two
jobs, obtaining an apartment, furniture, and a car, and completing most of the
services required by the agency.  She
also notes that her mother testified that, at the end of the school year, she
intended to return Ms. Woods’s two older children to her.  Despite this, she contends, the agency was
unwilling to permit her to continue to improve and complete the remainder of
her services, because it wanted her parental rights terminated so that B.S.W.
could be adopted by the Hutchinses.

In determining the best interest of the
child, a number of factors may be considered, including the following:  

·                     
the
desires of the child;

·                     
the
emotional and physical needs of the child now and in the future;

·                     
the
emotional and physical danger to the child now and in the future;

·                     
the
parental abilities of the individuals seeking custody;

·                     
the
programs available to assist these individuals; 


·                     
the
plans for the child by these individuals;

·                     
the
stability of the home;

·                     
 the acts or omissions of the parent which may
indicate that the existing parent‑child relationship is not a proper one;
and

·                     
any excuse for the acts or omissions of the parent.

Holley, 544 S.W.2d at 371–72.  These factors, often called Holley
factors, are not exhaustive; some listed factors may not apply to some cases,
while other factors not on the list may also be considered when
appropriate.  In re C.H., 89
S.W.3d at 27.  Undisputed evidence of
just one factor may be sufficient in a particular case to support a finding
that termination is in the best interest of the child.  Id. 
Conversely, the presence of scant evidence relevant to each Holley
factor will not support such a finding.  Id.  Evidence that proves one or more statutory
grounds for termination may also constitute evidence illustrating that
termination is in the child's best interest. 
Id. at 28. 

Reviewing the evidence, we find it is
legally and factually sufficient to support the finding that termination was in
B.S.W.’s best interest, as discussed below.








The child’s desires.  B.S.W. was not questioned whether she wanted
her mother’s parental rights terminated. 
However, the Hutchinses and others who observed her believed she had
negative reactions after visits with Ms. Woods.

The child’s emotional and physical
needs.  B.S.W. was placed in
individual therapy because she was observed to be hyperactive and was sexually
acting out with stuffed animals.  The
therapy was continuing, and at the time of trial she was described as doing
well.  Other evidence showed that she
improved after coming into the care of the Hutchinses.  

The emotional and physical danger
to the child, now and in the future. 
No evidence showed that Ms. Woods directly caused physical injury to B.S.W.  That does not undermine any finding by the
court, though, because other facts showed potential danger to B.S.W.  The evidence showed that, while B.S.W. was in
her care, Ms. Woods caused physical injury to herself by cutting herself while
under the influence of drugs. 
Additionally, Ms. Woods relapsed just four months before the trial of
this case.  Such evidence was relevant to
the possibility of emotional or physical danger to B.S.W. if Ms. Woods were to
relapse again.  The trial court could
also consider the emotional danger to B.S.W. in continuing a relationship with
a mother who would come in and out of her life because of drug use or
incarceration, disrupting any permanency or stability for B.S.W.








The parental abilities of the
individual seeking custody.  The record
contains very little evidence of any parental responsibilities on Ms. Woods’s
part.  Most of Ms. Woods’s parental
responsibilities have been performed by others. 
Her mother assumed care of her two oldest children, and continued to do
so at the time of trial.  The Hutchinses
assumed care of B.S.W. for most of her life; first at Ms. Woods’s request and
then after they intervened in this suit. 
During the time others cared for Ms. Woods’s children, Ms. Woods
provided little or no financial assistance to these care givers.  Ms. Woods points out that she has completed
parenting classes, is employed, and has an apartment with a bed for B.S.W.  However, these facts, while admirable, do not
alone demonstrate that Ms. Woods is capable of parenting B.S.W.  Ms. Woods’s relapse into drug activity just a
few months before trial—while she was under the court’s scrutiny—weighs against
her ability to parent B.S.W.  Moreover,
her return to cocaine use demonstrates a continuing pattern of drug abuse that
the trial court could have found rendered her unable to care for her older
children and, later, was the reason she left B.S.W. with Ms. Hutchins.

The programs available to assist
these individuals in promoting the child’s best interest.  Ms. Woods stresses that she has completed
parenting, substance abuse, and other classes the agency required.  However, despite completing several drug
treatment programs, Ms. Woods relapsed into drug use shortly before the trial
in this case.  Her actions demonstrated
that she failed to put to use the instructions she received, and she did not
appear to consider the effect of her action on B.S.W. or this case.  While Ms. Woods indicated a desire at the
time of trial to do what would be necessary for B.S.W., the court could have
determined that she lacked the ability to successfully implement any program.

Plans for the child by the
individual or agency seeking custody. 
The agency maintains that its plan for B.S.W. is to terminate Ms.
Woods’s parental rights so B.S.W. can be placed in a safe and secure
environment.  The caseworker testified
that B.S.W. is “very much adoptable.” 
The evidence showed that the Hutchinses have provided a good environment
for B.S.W., and have expressed a desire to adopt her.  The trial court could have concluded, given
Ms. Woods’s history as outlined above, termination of her parental rights was
in B.S.W.’s best interest.

The stability of the home or
proposed placement.  Ms. Woods has
failed to show that she is stable enough to parent B.S.W. for any prolonged
period.  The trial court was entitled to
determine that this pattern would likely continue and that permanency could
only be achieved through termination and adoption.








The parent’s act or omission which
may indicate the existing parent-child relationship is not a proper one.  As discussed above, Ms. Woods has a history
of drug use and criminal activity that endangered B.S.W.’s well-being.  And, on at least one occasion, Ms. Woods left
B.S.W. to be cared for by a woman she only recently met who demanded $50 to
return the child to Ms. Hutchins.  The
trial court was free to assess the weight of this evidence and the credibility
of the witnesses when considering whether termination of Ms. Woods’s parental
rights would be in B.S.W.’s best interest.

Any excuse for the parent’s acts or
omissions.  Ms. Woods offered no excuse
for her actions, but only admitted she made “bad choices.”  She stresses her desire to move on from the
January relapse, but her desire alone does not erase the other evidence
weighing against her.

On this record, the evidence was legally
and factually sufficient to support a finding that termination was in B.S.W.’s
best interest.  Ms. Woods’s third issue
is overruled.

III.      Conclusion

We overrule Ms. Woods’s three issues and
affirm the trial court’s judgment.

 

 

 

/s/      Wanda McKee Fowler

Justice

 

 

 

Judgment
rendered and Memorandum Opinion December 23, 2004.

Panel
consists of Chief Justice Hedges and Justices Fowler and Seymore.











[1]  At the time of
B.S.W.’s birth, Ms. Woods was married to another man, who was
incarcerated.  Mr. Steinback’s parental
rights were also terminated, on a finding of constructive abandonment, and he
did not appeal. 





[2]  Ms. Hutchins
testified she returned B.S.W. to Ms. Woods in March of 2002.





[3]  Ms. Hutchins
testified that Mr. Steinback occasionally gave her $20 for B.S.W.





[4]  When Ms. Woods
left the SAFPE program, she was “transitioned” into a halfway house where she
participated in a substance abuse program, and also attended programs at Keller
House.





[5]  In the
records, the agency is also identified as the Department of Family and
Protective Services.





[6]  The record
also does not reflect that the parties consented to a continuance, and Ms. Woods
does not contend that a continuance should have been granted by operation of
law.  See Tex. R. App. P. 251.